IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | |
| | ) | |
| V. | ) | Case No. 23-CR-426-JEB |
| | ) | |
| | ) | |
| PHILLIP CRAWFORD | ) | |

**DEFENDANT PHILLIP CRAWFORD'S RESPONSE TO THE
GOVERNMENT'S POST-TRIAL BRIEF**

Defendant Phillip Crawford, by counsel, submits this response to the
government's Post-Trial Brief. First, the government failed to prove beyond a
reasonable doubt that Mr. Crawford committed an offense involving "physical
contact with the victim" under 18 U.S.C. § 111(a). Second, 18 U.S.C. § 231(a)(3)
should not serve as the "other felony" within the meaning of § 111(a) based upon
the same conduct as the alleged § 111(a) violation and overlapping elements.
Alternatively, Mr. Crawford's last-ditch throw of a rubber mask in frustration
before immediately turning to leave, does not support a finding beyond a
reasonable doubt that he had the intent to commit a violation of § 231. In the
absence of either "physical contact with the victim" or the intent to commit
"another felony," the Court should acquit on Count 6. Finally, Mr. Crawford
waives any right that he may have for an in-person delivery of the verdict as to
Count 6.

1

## FACTS

The trial of this matter occurred on June 17 and 18. With respect to Count 6, the government presented evidence that Mr. Crawford, at or about 4:13:30 p.m., threw a rubber and plastic gas mask toward a line of police officers wearing protective gear, including armored plates on their shoulders, arms, legs, and chest, as well as helmets with face shields. The only evidence presented at trial was that the mask was found on the ground by Mr. Crawford, held for only moments, and then thrown seconds before he turned to leave. This last act before departing was one of exasperation and frustration. There was no goal or purpose to it.

The government opted not to present testimony from MPD Office Wilhoit, the individual standing behind a large plastic U.S. Capitol Police shield that the mask struck before it dropped to the ground. Nor did the government call *any* fact witness to the event. No one testified that the mask struck any part of Officer Wilhoit's body, clothing, or anything that he was holding in his hands. Thus, there is <u>no</u> evidence that the mask made physical contact with Officer Wilhoit, directly or indirectly. The only evidence is that the mask hit a shield positioned in front of Officer Wilhoit.

During closing arguments, Mr. Crawford's counsel argued the absence of evidence of "physical contact," as the mask struck only a plastic shield in front of the purported victim. This prompted discussion about what it means for there to

be "physical contact with the victim" within the meaning of 18 U.S.C. § 111(a), the remaining charge in Count 6. Counsel for Mr. Crawford likened the situation to the mask hitting a trashcan in front of a purported victim. The Court posed the question to the government about whether physical contact would occur if an officer moved behind a car hit by a thrown item. The Court then requested briefing on the issue, as well as on the issue of whether Mr. Crawford's act of throwing the mask satisfies the "intent to commit another felony" aspect of § 111(a), specifically as a violation of 18 U.S.C. § 231. The government did not meet its burden to prove beyond a reasonable doubt a felony violation of § 111(a) under either the "physical contact" or "other felony" prongs of the statute.

## ARGUMENT

### I.  The Government Failed to Prove a "Physical Contact" Violation of 18 U.S.C. § 111(a).

The government makes two arguments in support of a "physical contact" conviction on Count 6. First, it argues that the mask made physical contact with Officer Wilhoit's body. Second, that if the mask did not hit Officer Wilhoit, it hit a shield in front of him which is enough. Both arguments fail.

#### A.  The Mask Did Not Make Physical Contact with Officer Wilhoit.

The government claims that the evidence at trial supports a conclusion that the gas mask actually made direct contact with Officer Wilhoit himself. (Doc. 68 at

2). It bases this conclusion on the proposition that one can hear the impact of the mask before it tumbles down the shield to the ground. (Id.). This is rank speculation. Moreover, the only evidence at trial was that the mask hit a shield, nothing more. Video footage and screen shots support this conclusion alone. (Def. Exs. 104A, 202, 203). Of course, the government could have called Officer Wilhoit to testify, but it did not. It cannot now speculate and claim physical contact by the mask with Officer Wilhoit's person without *any* proof, much less proof beyond a reasonable doubt. The government's initial, hollow claim is easily dispatched.

### B.     The Mask Did Not Make Physical Contact with Any Object Intimately Connected to Officer Wilhoit.

The government's next argument merits more attention but it still falls short. The government argues that "physical contact with the victim" as used in § 111(a) includes contact with an object intimately connected with the victim's body. The government draws on authority from common law concepts of battery and decisions addressing various state civil and criminal battery statutes. (Doc. 68 at 3-6); *See United States v. Lehi*, 446 Fed. Appx. 96, 100 (10th Cir. 2011) (likening a "physical contact" violation of § 111(a) to a battery). None of the legal principles or cases cited by the government change the fact that, here, there was no physical contact with Officer Wilhoit or any object he held or that was intimately connected to him. The mask hit a four-foot high plastic shield in front of him. Moreover, the

few January 6 decisions the government cites involving shields (Doc. 68 at 7) are readily distinguishable.

As an initial matter, Mr. Crawford has never taken the position that § 111(a) requires direct body-to-body contact. (Doc. 68 at 4). Of course, throwing an object that makes physical contact with the victim can amount to a battery as well as a violation of § 111(a). Thus, the government's cases pointing out that spitting on a person, throwing urine on them, or even putting a foreign substance in a drink they consume, are not controversial. (Id.). In each of these cases, whether civil or criminal, there was physical contact with the victim.[1]

The more nuanced issue and the one relevant to this case is whether and when physical contact with an object, but not the alleged victim's body, amounts to a "physical contact" violation of § 111(a). The common law notion of battery involves intentional, harmful or offensive physical contact with another person. Case law has extended the notion of contact with "the person" to include physical contact with personal objects intimately connected to the victim. The government's

---

[1] See e.g., *United States v. Stoddard,* 407 Fed. Appx. 231, 233 (9th Cir. 2011) (spitting directly in the face of a correctional officer constituted a violation of § 111(a)) (citing cases); *United States v. Taliafero,* 211 F.3d 412, 415 (7th Cir. 2000) (throwing urine on a prison guard violated § 111(a)); *State v. Dawson*, 985 S.W.2d 941, 952 (Miss Ct. App. 1999) (placing bodily fluid in drink consumed by victim was battery under Mississippi statute); *Lehi*, 446 Fed. Appx. at 100 (spitting in face of federal officer, including his eye, violated § 111(a)). (Doc. 68, Gov. Brf. at 4).

cases bear this out and fall into two distinct categories – cases where physical contact is made with the victim's clothing, or physical contact with a personal item held in the victim's hand. (See Doc. 68 at 5-7).

Thus, grabbing a personal item held in the hand of a victim may be enough. It was in *Fisher v. Carrousel Motor Hotel Inc.*,[2] where the grabbing of a dinner plate held in the hand of a patron in a buffet line (combined with racial epithets), was sufficiently personal and intimately connected to the victim to amount to battery under Texas law. (Doc. 68 at 5). So too, in *State v. Ortega*,[3] a flashlight the defendant knocked from an officer's hand was intimately connected to the officer's person and satisfied New Mexico's statute proscribing battery on a peace officer. (Id. at 6). Similarly, in *United States v. Pruitt*,[4] grabbing a gun held in the hand of a police officer supported a battery charge. (Id.). The legal principle is that an item held closely in one's hand becomes part of the body for purposes of battery.[5] And, grabbing, wresting, or snatching it away can amount to battery.

---

[2] 424 S.W.2d 627, 629 (Tex. 1967).

[3] 827 P.2d 152 (N.M. Ct. App. 1991).

[4] 999 F.3d 1017, 1029 (6thCir. 2021).

[5] See *State v. Nash*, 766 So.2d 310 (Fla. App. 1991) (grabbing purse "closely held" by victim during robbery constituted aggravated battery under Fla. Stat. § 784.03(1)) and *Morgan v. Loyacomo*, 1 So.2d 510, 511 (Miss. 1941) (forcibly seizing package held under arm constituted battery). (Doc. 68 at 5-6).

The other cases relied on by the government demonstrate that unwanted physical contact with a person's clothing can support criminal battery. Perhaps even more intimately connected to the person than an item held closely in one's hand is clothing. *Stokes v. State*, cited by the government (Doc. 68 at 6), demonstrates this principle. There, the victim's necktie was perforated by powder burns from a gunshot and his shirt creased by the bullet. *Id*. That was enough to sustain the defendant's conviction for aggravated battery under Indiana law. *See also Powers v. Kallis,* 2018 WL 10322041 at * 2 (C.D. Ill., July 20, 2018) (battery occurred when petitioner stomped on milk carton which splattered milk on pants of correctional officers, as pants were intimately connected to the person of officers). An individual's apparel is so intimately connected to their person that it is regarded as part of the person for purposes of battery.

Courts look to the *intimate* nature of the connection between the item and the body when deciding whether it is an extension of the body for purposes of battery. Thus, in *Impson v. State*, 721 N.E.2d 1275, 1285 (Ind. Ct. App. 2000), physical contact with reading glasses (i.e., by knocking them off), but without touching the victim's face, supported a battery conviction. Reading glasses are highly personal and therefore, like apparel, part of the person. Other items which might satisfy this intimate connection standard include a hat or even a phone held by the victim. *See Lift-Up Inc. v. Colony Insurance Company*, 261 A.3d 825, 835-36

(Conn. App. 2021) (slapping hat off victim's head and snatching of a phone was battery for purposes of insurance exclusion). So, how and where is the line to be drawn?

In *Clark v. State,* a Florida appellate court looked at how to determine when there is sufficient intimate connection between an object and the person to support a battery offense. There, twice, the defendant intentionally crashed his car into the victim's car damaging the victim's car and spinning it around. *Id.* at 1240. The defendant claimed there was no physical contact with the victim, just the car. The court explained: "[W]hether an object is sufficiently closely connected to a person such that touching or striking the object would be a battery on that person will depend upon the circumstances of each case" and generally, would be for the jury. *Id.* The trial court properly submitted the issue to the jury because, on the facts, the victim was undoubtedly more than "jostled" and a jury could find the necessary physical disturbance or contact. *Id.* The court looked to an Idaho Supreme Court decision on the same issue which held:

> Indeed, we have little difficulty in concluding that intentionally striking a car with a pickup truck, when both vehicles are being operated at 35 miles per hour would generate whatever physical disturbance may be implicitly required by the statute.

*Id.* at 1241 (citing *State v. Townsend*, 865 P.2d 972 (Idaho 1993)).

Seemingly standing in the way of the holding in *Clark* was another Florida appellate decision, *Williamson v. State*, 510 So.2d 335 (Fla. App. 1987), which held

that a state trooper's car could not be considered an extension of his person. There, the defendant crashed his car into the side of the car occupied by the state trooper. The court in *Williamson* concluded:

> The touching or striking in the present case was to the outer body of an automobile which Trooper Thomas was driving, with no direct impact upon or even injury to the trooper. In fact, the evidence shows that the trooper was not even jostled about in the car as a result of the impact. We conclude as a matter of law the automobile in this case did not have such an intimate connection with the person of the trooper so as to conclude that battery occurred.

*Clark,* 746 So.2d at 1240 (citing *Williamson*, supra. at 338). Ultimately, *Clark* noted *Williamson* and certified the potential conflict to the state Supreme Court. *Id.* at 1241.

The Florida Supreme Court looked at the issue and found that the appellate court was correct in its analysis because the facts in *Clark* demonstrated that the degree of impact "spun" the occupant of the vehicle. *Clark v. State*, 783 So.2d 967, 969 (Fla. 2001). That was enough to amount to physical contact to the occupant. *Id*. Further, *Williamson* did not establish a per se rule regarding cars, so there was no conflict. *Id*. The Court agreed that whether an automobile is intimately connected to the person is a factual issue which, in *Clark*, turned on the degree of impact and effect on the occupant. *Id*. It was enough. The decision was approved.

A concurring opinion in *Clark* highlights the difficulty with a battery analysis based upon the notion of an intimate connection between the person and

an object - - at least in the context of item not worn or held, there a car. *Id.* at 969. Rather than the "connection" to the object, the concurrence explained that the real issue is whether the person was "touched" through the force of the collision by being jostled or impacted. *Id.* Finally, the concurrence urged the State to legislate against this particular type of impact – intentional car collision – rather than using the legal fiction of battery. *Id.*

*Clark* is helpful here because the undisputed evidence shows that Officer Wilhoit was not wearing or holding the shield. So, the cases dealing with clothing or personal items closely held in the hand are not applicable. The shield was a U.S. Capitol Police shield, not an MPD shield issued to Wilhoit. It was found a found item placed in between MPD Officer Wilhoit and the line of protestors. In addition, the shield extended from the ground about four feet up and above his waist level. Finally, in contrast to *Clark*, the government presented no evidence here to conclude, certainly not beyond a reasonable doubt, that the collision of the mask with the shield resulted in any physical contact with Officer Wilhoit through the transfer of energy from the shield or otherwise. In fact, it is not known if Officer Wilhoit even noticed it; he did not testify. This case is more akin to the *Williamson* decision than *Clark* because there is no evidence of any effect of the impact on the purported "victim." For this reason, the Court should find that the government failed to prove a "physical contact" violation of § 111(a).

The government cites two January 6 cases involving officer shields in support of its position that contact with the shield here is sufficient. (Doc. 68 at 7-8). Each of these cases is readily distinguishable because both involve direct physical altercations with the officers and the shields they held. In *United States v. Samsel*, 21-CR-537-JMC (D.D.C. February 9, 2024) at ECF No. 345, p. 12, a defendant attempted to "rip" a shield from an officer's hands. Similarly, *United States v. Matthew DaSilva*, 21-CR-564-CJN (D.D.C. July 19, 2023) involved a defendant grabbing a riot shield held by an officer and using his full weight to push against the officer to take the shield. The officer struggled to hang on. Contrary to the government's conclusion (Doc. 68 at 9), this case is nothing like *Samsel or DaSilva*.

The government did not prove the physical contact prong of § 111(a). The government's argument about congressional intent does not change that. (Doc. 68 at 10-11). Notwithstanding Congress's goal to provide broad protection to federal officers, it did not eliminate the required element of "physical contact." Moreover, Congress chose not to define "physical contact" such that it would expand traditional notions of battery beyond actual physical contact with the person or an intimate extension – clothing or an item held in the hand. Even at the outer edge of battery, such as in *Clark*, there must be some evidence of a physical disturbance to the victim. There is no such evidence here.

To the extent the government complains about any ambiguity in § 111 or anomalous comparative outcomes, Mr. Crawford has three responses. First, the government could have chosen to try to prove the actual offense by calling the purported victim to establish the requisite impact. It did not. Second, the government could concede its failure of proof and argue that this act by Mr. Crawford constituted a misdemeanor violation of § 111(a) which involves no "physical contact." In that regard, contrary to its argument, unsuccessful attempts to make physical contact are indeed still subject to prosecution and punishment, also serving the congressional goal. Finally, Mr. Crawford notes the countervailing interest that an accused should not be subject to prosecution and conviction under a criminal statute because the government thinks it should be expanded to cover certain vague situations. The rule of lenity would preclude that approach. At bottom, the government's proof failed. The Court should acquit on Count 6.

## II.   The Government Failed to Prove that Mr. Crawford Violated § 111(a) by Having "the Intent to Commit Another Felony."

Alternatively, the government argues that Mr. Crawford had the "intent to commit another felony," specifically a violation of 18 U.S.C. § 231(a)(3), when he threw the mask, and therefore he committed a felony violation of § 111(a) in Count

6.[6] Mr. Crawford disagrees. First, Mr. Crawford's plea to a violation of § 231 in Count 1 did not encompass the throwing of the gas mask. Second, § 231 should not otherwise serve as the basis a felony conviction under § 111(a). And, finally, even if § 231 could satisfy the "another felony" element for purposes of § 111(a), here, the government has failed to prove beyond a reasonable doubt that Mr. Crawford intended to commit a violation of § 231 when he tossed the mask and immediately left.

### A. Mr. Crawford's Plea to Violating 18 U.S.C. § 231(a)(3) in Count 1 Does Not Carry the Day.

On May 17, 2024, Mr. Crawford pled to several counts in the Superseding Indictment including Count 1, alleging a violation of § 231(a)(3). In his Statement of the Offense, Mr. Crawford conceded that the events of January 6, between 12:53 p.m. and 6:30 p.m. amounted to a public disturbance involving acts of violence which caused injury or damage to a person or property. (Doc. 52, Statement of the Offense). Mr. Crawford also admitted that between 4:10:42 p.m. and 4:13:38, he committed at least one act of obstruction or interference that satisfied § 231. (Id.). Mr. Crawford's pled to Counts 2 through 5, all violations of § 111(a) during that

---

[6] Mr. Crawford can only be convicted of felony assault if the relevant acts involve either "physical contact with the victim of that assault or the intent to commit another felony." 18 U.S.C. § 111(a).

time frame and all prior to his throw of the mask.[7] (Id.). He did not, however, plead to Count 6. Nor did he admit that his act of tossing the gas mask, as set forth in Count 6, constituted an act of obstruction or interference with law enforcement in violation of § 231. Contrary to the government's conclusion, Mr. Crawford's plea to Count 1 does not satisfy the government's burden of proving the elements of Count 6, including that the specific violation of § 111(a) contained in Count 6 occurred "with the intent to commit another felony." (See Doc. 68 at 14-15).

**B.    A Hypothetical Violation of § 231(a)(3) Should Not Serve as the Predicate "Other Felony" in Count 6.**

According to the government, "[t]he intent to violate 18 U.S.C. § 231 can be the 'intent to commit another felony' for a conviction of felony 18 U.S.C. § 111(a)." (Doc. 68 at 10). Thus, it claims, when Mr. Crawford threw the mask, not only did he violate § 111(a), he had the intent to violate § 231(a)(3) and therefore committed a felony.

As an initial matter, Mr. Crawford understands that § 111(a) and § 231(a)(3) are "different" felonies within the meaning of *Blockburger*.[8] *See United States v. Stevens*, No. 23-3046, 2024 WL 3211587, at *6 (D.C. Cir. June 28, 2024) (noting the felonies have "distinct features"). Here, the Court recognized as much during

---

[7] With respect to Counts 2 through 5, Mr. Crawford pled guilty to the "physical contact" prong of 18 U.S.C. § 111(a).

[8] *Blockburger v. United States*, 284 U.S. 299 (1934).

closing arguments, yet understandably presented the question of whether a simultaneous violation of § 231, for largely the same conduct and intent as alleged for the § 111(a) violation, could amount to a felony aggravator. Mr. Crawford urges the Court to answer this question in the negative.

### 1.    *United States v. Stevens* Does Not Control.

The government cites to *Stevens*, supra., and argues that the D.C. Circuit has decided this issue by concluding that § 231(a)(3) constitutes "another felony" separate from § 111(a) within the meaning of "aggravated assault" in the commentary to U.S.S.G. § 2A2.2. (Doc. 68 at 10-11). It claims that the statutory analysis here and Guidelines *commentary* analysis in *Stevens* are identical. (Id. at 11). Not so.

At issue in *Stevens* was whether U.S.S.G. § 2A2.2 should apply at sentencing based upon the claim that Mr. Stevens' assault convictions under § 111(a) were felonious assaults that involved "an intent to commit another felony," namely a violation of § 231. *Id*. at * 6. U.S.S.G. § 2A2.4 directs a court to apply § 2A2.2 when a defendant's conduct amounts to "aggravated assault" which includes "felonious assault that involved," among other aggravators, "an intent to commit another felony." *See* U.S.S.G. § 2A2.4(c) (cross reference); U.S.S.G. § 2A2.2, Application Note 1 (defining "aggravated assault"). The D.C. Circuit held that § 231 could

serve as "another felony" for purposes of applying § 2A2.2 because it was distinct from § 111(a). *Id*. at * 6.

Importantly, in *Stevens*, at a bench trial, Mr. Stevens was convicted of four felony assaults on federal officers under § 111(a) *because* the court determined that he had the intent to commit another felony – civil disorder under § 231 (a)(3). *Id*. at * 3. Thus, before sentencing, the court determined that Stevens possessed the intent to commit a violation of § 231(a)(3). That is what made the assaults "felonious" in the first place under § 111(a). *See* U.S.S.G. § 2A2.2, Application Note 1 (defining "aggravated assault"). But, according to the Court, it could also serve as the aggravating "other felony" under the application note. So, the inquiry about which Guideline should apply was relatively limited and seemingly foreclosed by what the trial judge found at the guilt-innocence stage. In essence, the D.C. Circuit was faced with the issue of whether, as a matter of law, § 231 is deficient as "another felony" under § 2A2.2's commentary. In that context, it wasn't.

By contrast, here, § 111(a) is a criminal statute, not commentary to an advisory Guideline. This is an important distinction, and one which distinguishes *Stevens*. Although *Stevens* involved interpretation of the phrase "an intent to commit another felony," it was in the context of determining which advisory Guideline to apply for purposes of sentencing, not defining the standard for

criminal culpability under a statute of general application. There are fundamental differences.

For example, courts have questioned or outright refused to apply the rule of lenity to purely advisory Guidelines. *See United States v. Vargas*, 74 F.4th 673, 697 (5th Cir. 2023) (deciding the rule of lenity no longer applies to purely advisory Guidelines); *United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010) (Pryor, C.J., concurring) (writing to explain why rule of lenity should not apply to Guidelines). There are other important limitations on a defendant's constitutional rights relative to the Guidelines that do not exist where criminal statutes are concerned. *See Beckles v. United States*, 580 U.S. 256, 266-67 (2017) (holding that Guidelines are not susceptible to void-for-vagueness challenge). In addition, due process is satisfied at sentencing by findings supported by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148, 157 (1997); *United States v. Dorcely*, 454 F.3d 366, 372-73 (D.C. Cir. 2006).

In sum, the legal conclusion in *Stevens* about what "an intent to commit another felony" means under Application Note 1 to § 2A2.2 does not apply here. Based upon the posture of *Stevens* and its context, the analysis is certainly not the same as the government concludes. *Stevens* is not helpful.

**2.    Section 111(a) Is Too Vague to Support the Conclusion that a Violation of Section 231(a)(3) Can Serve as the "Other Felony" in This Case.**

The text of 18 U.S.C. § 111(a) provides:

(a) In general. –Whoever–

    (1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties; or

    (2) forcibly assaults or intimidates any person who formerly served as a person designated in section 1114 on account of the performance of official duties during such person's term of service,

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or <u>the intent to commit another felony</u>, be fined under this title or   imprisoned not more than 8 years, or both.

18 U.S.C. § 111(a) (emphasis added). The relevant question here is what the statute means by "the intent to commit another felony."

The statute does not define "another felony." So, pursuant to "the most fundamental semantic rule of interpretation," A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012), the word "another" should be given its ordinary, everyday meaning. In the phrase "intent to commit another felony," "another" is used as an adjective, modifying "felony." And Merriam-Webster dictionary defines the adjective use of "another" in several ways: (1) "different or

18

distinct from the one first considered," (2) "some other," and (3) "being one more in addition to one or more of the same kind."[9]

But none of these potential definitions resolves the issue. The fact that "another felony" must be "distinct or different" from § 111(a) or "some other" felony than § 111(a) does not answer the crucial question. To be convicted of a § 111(a) felony, must the defendant intend to commit a *distinctly different* felony involving independent felonious intent and conduct or, whether the same conduct which happens to contemporaneously violate another statute that is technically distinct under the law is enough. Mr. Crawford believes it should be the former, particularly when there is no meaningful way to distinguish a defendant's intent as it relates to the "other felony." A look at the statutes reveals the problem.

Section 111(a) punishes anyone who "assaults, resists, opposes, impedes, intimidates, or interferes" with a federal officer then engaged in the performance of his official duties. If those actions are done with "the intent to commit *another* felony" then the § 111(a) conduct transforms into a felony. In turn, 18 U.S.C. § 231(a)(3) punishes anyone who commits "any act to obstruct, impede, or interfere with" a law enforcement officer engaged in the lawful performance of his duties during and in relation to a civil disorder. It reads:

---

[9] *Another*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/another (last accessed July 11, 2024).

> Whoever commits or attempts to commit any act to <u>obstruct, impede,</u> <u>or interfere</u> with any . . . law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

18 U.S.C. § 231(a)(3)(emphasis added).

The difficulty with the "other felony" analysis is evident when one asks the question, in the context of a civil disorder: Did the defendant "resist, oppose, impede, or interfere" with a law enforcement officer (§ 111(a)) with the intent to "obstruct, impede or interfere with" a law enforcement officer during an in relation to a civil disorder (§ 231(a)(3))? In this context, the overlap of these statutes makes the practical application of the felony enhancement in § 111(a) – for having the intent to commit "another felony" – unworkable.

Each of the statutes prohibits obstructing, impeding, or interfering with law enforcement officials performing official duties. *United States v. Montez*, 36 F.4th 824, 826 (8th Cir. 2022) (comparing §§ 111(a) and 231(a)(3) and finding that the "shared prohibition on obstructing, impeding, or interfering with law enforcement" warranted application of U.S.S.G. § 2A2.4). And, while § 231(a)(3) adds the element that the acts of interference occur during a civil disorder, that aspect does not bear on a defendant's intent – the defining feature for a *felony* enhancement under § 111. Nor does the requirement that the civil disorder impact

commerce or a federal function. These are additional *Blockburger* elements, but a defendant need not be aware of those facts. In other words, these elements are "distinct requirements" under the law which make § 231 different or "other than" § 111, but not in a way relevant to a defendant's "intent to commit another felony," within § 111(a). *See Stevens*, supra. at *6 (pointing out these "distinct requirements").

Nor is there a sufficient demarcation between the intent required under § 111(a) and that required under § 231(a)(3). As the Supreme Court held in *United States v. Feola*, 420 U.S. 671, 686 (1975), "in order to incur criminal liability under § 111, an actor must entertain merely the criminal intent to do the acts therein specified," i.e., the acts of resistance, opposition, or interference with federal law enforcement. According to very recent case law in this district, § 231(a)(3) criminalizes acts performed "with the intent to obstruct, impede, or interfere with a law enforcement officer." *United States v. McHugh*, 583 F. Supp. 3d 1, 25 (D.D.C., February 1, 2022) (noting the absence of a D.C. Circuit decision deciding the issue of the proper *mens rea* under § 231(a)(3)). Thus, while § 111(a) criminalizes obstruction or interference with law enforcement without regard to the defendant's specific intent (i.e., such as knowledge of law enforcement status), *Feola*, supra. at 684, § 231(a)(3) appears to require a specific intent to obstruct a law enforcement officer. *McHugh*, 583 F. Supp. 3d at 25.

Such a subtle distinction regarding intent offers little room for a reliable decision about whether to apply a felony enhancement which catapults punishment from 0-12 months to 0-8 years. *See* 18 U.S.C. § 111(a). In the context of a public disturbance or First Amendment gathering, where officers are clearly in uniform, a person may be held to a felony, strict liability standard for obstructing, impeding, or interfering with an officer under § 111(a) based only upon a finding that he "intended to" so interfere. It is far from clear that Congress had that in mind when it enhanced punishment under § 111(a) for an intent to commit *another* felony. At a bare minimum, the phrase "intent to commit *another felony*" contained in § 111(a) is ambiguous and, pursuant to the rule of lenity, should be interpreted narrowly and in a manner favorable to Mr. Crawford.

> **3.** **The Rule of Lenity Should Apply to Prevent Felony Punishment Under Section 111(a) for the "Intent to Commit Another Felony."**

The rule of lenity can be stated succinctly: "Ambiguity in a statute defining a crime or imposing a penalty should be resolved in the defendant's favor." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 296 (2012). Justice Gorsuch's concurrence in *Wooden v. United States*, 595 U.S. 360, 388-389 (2022) contains a thorough analysis of the history and constitutional basis for the rule, as well as a poignant condemnation of the frequent misapplications and misinterpretations of when it should apply. Stated simply, the rule protects the

public's rights, under the Fifth and Fourteenth Amendments, to fair notice of what the law prohibits. *Id*. at 389. Where uncertainly exists, "the law gives way to liberty." *Id*. at 391. The rule of lenity also protects the separation of powers embodied in Article I, Section 1 of the U.S. Constitution. *Id*. As Justice Gorsuch stated: "Lenity helps safeguard this design by preventing judges from intentionally or inadvertently exploiting 'doubtful' statutory 'expressions' to enforce their own sensibilities." *Id*.

The rule applies when, after using traditional tools of statutory construction, a criminal statute is ambiguous. *Shular v. United States*, 589 U.S. 154, 165 (2020); *see also United States v. Smith*, 104 F.4th 314, 330 (D.C. Cir. 2024) ("[The rule of lenity] applies only when a criminal statute is ambiguous after exhausting traditional tools of statutory construction."). Here, no rule of statutory construction resolves the issue.

The government cites *United States v. Samuel Camargo*, No. 21-CR-70-ABJ, for the holding that "another felony" within § 111(a) should include a violation of § 231(a)(3). (Doc. 68 at 13). There, the Court found that a "plain meaning" interpretation of "another felony" resolves the issue. (Id.) (quoting *Camargo,* ECF No. 114 at 9-12). However, the inquiry defies a "plain meaning" resolution. Perhaps that is why the issue was the subject of controversy and appeal in *Stevens* and briefing in this case. "Another felony" could mean a wholly distinct felony

involving *additional* felonious conduct, a separate victim or harm, or even a future event. After all, the statute does not allow enhancement for "any" felony offense; it specifically requires "another" offense. Or, as the government urges, "another felony" could be construed to mean a technical violation of two statutes contemporaneously with the same behavior under a pure *Blockburger* analysis. The use of "intent to commit another felony" in § 111(a) is vague.[10] And, neither statutory interpretation, nor legislative purpose help.

Because the phrase "intent to commit another felony" is vague, the Court should apply the rule of lenity. That does not mean that the Court must determine what the phrase means in all cases. Rather, the rule of lenity requires the strict and narrow construction of the vague term in favor of Mr. Crawford and against broadening criminal liability and punishment. Here, the Court should preclude a felony enhancement under § 111 based upon a purported violation of § 231(a)(3).

---

[10] *See United States v. Fenton*, 309 F.3d 825, 826 (3d Cir. 2002)(holding that a state law crime, involving conduct identical and coterminous with a federal crime, cannot be considered "another felony offense" under then-U.S.S.G. 2K2.1(b)(5)), *superseded by regulation as recognized in United States v. Keller*, 666 F.3d 103 (3d Cir. 2011). In *Fenton*, the defendant robbed a sporting goods store and stole guns. He was convicted of being a felon in possession of the guns. And, he was enhanced under then-§2K2.1(b)(5) for having possessed the guns in connection with "another felony offense," specifically the state burglary. The Third Circuit interpreted "another felony offense" to require an offense involving different conduct.

### C.    The Government Has Not Met Its Burden of Proof.

Irrespective of this Court's ultimate decision concerning the meaning of "intent to commit another felony," within § 111(a), the government has failed to meet its burden. The government has not proven beyond a reasonable doubt that Mr. Crawford intended to commit another felony, including § 231(a)(3), either at the moment he threw the mask or at any point afterwards.

What is clear from the evidence at trial is that Mr. Crawford's last act before leaving the Lower West Terrace Tunnel area was to throw a mask he found on the ground moments earlier. This can be seen clearly in the body camera which captured the event. (Def. Ex. 104A). There was no evidence presented that Mr. Crawford possessed a specific intent to obstruct, impede, or interfere with law enforcement through this conduct. At the time of the throw, Mr. Crawford was six or seven feet away from the line of officers. The officers were not actively engaged with any protesters in the area where Mr. Crawford was located. Mr. Crawford threw the mask (Def. Ex. 104A, at 16:13:30), waived his arms forward in a gesture of frustration (Id. at 16:13:32), and immediately stepped back away from the officers, turned, and left. (Id. at 16:13:32 to 16:13:40). He did not reengage or try to enter the tunnel area or Capitol.

Immediately prior to Mr. Crawford throwing the mask, he had largely been on the ground, having himself been struck several times in the head by an officer.

Mr. Crawford can be seen in the video exhibits stumbling and falling over shields and debris in the area, pinned in by other protestors. A review of Def. Ex. 103B, Officer Henry Fould's body camera, shows Mr. Crawford on his knees being struck by officers in the head just before 4:12:00 p.m. (Def. Ex. 103B at 16:11:38 to 16:11:54). This same exhibit shows him, afterwards, laying back away from officers into the crowd without a shoe. (Def. Ex. 103B at 16:12:27). In Officer Jason Mastony's body camera footage, Mr. Crawford can be seen repeatedly tripping and falling but mostly on the ground. (Def. Ex. 105A).

The last instance where Mr. Crawford engaged with police in violation of § 111(a) involved Count 5 of the Superseding Indictment at 4:12:04 p.m. This was shortly after Mr. Crawford was hit in the head by an officer. (See Def. Ex. 103B at 16:11:38 to 16:11:54). Following this final confrontation, for about 1 ½ minutes, prior to throwing the mask in frustration and leaving, Mr. Crawford was on the ground dazed and defeated. There was no intent or purpose to this final act. Mr. Crawford was exhausted and himself injured. He left. The government has not proven that Mr. Crawford had the intent to commit a felony by his act of throwing the rubber mask. Nor should the Court presume such an intent in light of the circumstances and timing of the act in relation to his departure. For this reason, the Court should acquit on Count 6.

### III.    The Court Should Not Require Mr. Crawford's In-Person Presence for the Return of Its Verdict on Count 6.

After trial, the government raised the issue of whether the Court should require Mr. Crawford's physical presence in Court for the return of the verdict on Count 6. The Court requested that the parties address the issue in writing.

The government cites Fed. R. Crim. P. 43(a)(2) and argues that a defendant must be present, physically and in-person, at every stage of the trial including the return of the verdict. Of course, there are many rights which a defendant is guaranteed in criminal proceedings to ensure due process, including the protections that Rule 43 provides regarding his right to be present. This does not mean, however, that a defendant cannot choose to waive such a right. Mr. Crawford is willing to waive his right to be present in light of his presence for the Court's verdict on Counts 7, 8, 9, and 10. Only the verdict on Count 6 was held in abeyance. Travel to the District by Mr. Crawford would impose additional financial hardship on Mr. Crawford's family. Mr. Crawford was deemed indigent, and the Federal Defender was appointed to represent him from the outset of this case. Mr. Crawford has also suffered considerable loss of income since the case was initiated. Mr. Crawford's presence at trial and for the verdict on Counts 7-10 certainly serves the public interest which the government cites.

Moreover, Fed. R. Crim. P. 43(c)(2) contemplates waiver of presence by a defendant, including for the return of the verdict. It reads:

(c) WAIVING CONTINUED PRESENCE.

(1) In General. A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:

(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;

(B) in a noncapital case, when the defendant is voluntarily absent during sentencing; or

(C) when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

(2) Waiver's Effect. If the defendant waives the right to be present, the trial may proceed to completion, **including the verdict's return** and sentencing, during the defendant's absence.

Fed. R. Crim. P. 43(c)(emphasis added). Mr. Crawford was initially present at trial and would voluntarily agree to his absence at the return of the verdict.

Finally, Mr. Crawford is aware of another Court that has allowed the return of a verdict in writing without the defendant's in-person presence including for a felony civil disorder charge under 18 U.S.C. § 231(a)(3). In *United States v. Hicks*, 1:23-CR-399-JMC, the defendant requested the ability to be absent following a bench trial for the return of the verdict. (*See Hicks* at Minute Entry, dated 6/4/24). The defendant was ordered to execute a waiver, which he did. (Id. at Doc. 44). The verdict was returned without the defendant present. (Id. at Doc. 47).

28

Mr. Crawford is willing to execute a written waiver. Moreover, Mr. Crawford has been informed of his right to be physically present. Mr. Crawford is willing to appear by video conference to affirm his waiver on the record and under oath, as well as to appear for the return of the verdict in that manner, if acceptable. For the above reasons, Mr. Crawford respectfully requests that the Court allow him to waive his presence for the return of the verdict on the sole remaining count of the Superseding Indictment.

## CONCLUSION

WHEREFORE, for the above reasons, Mr. Crawford respectfully requests that the Court acquit on Count 6 and allow the waiver of his in-person appearance at the return of the verdict.

This 16th day of July 2024.


_/s/ Thomas L. Hawker_
THOMAS L. HAWKER
Georgia Bar No. 338670
Attorney for Phillip Crawford


Federal Defender Program, Inc.
Sute 1500, Centennial Tower
101 Marietta Street, NW
Atlanta, Georgia 30303
(404)688-7530
Thomas_Hawker@fd.org